# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **UHURU' SEKOU OBATAIYE-ALLAH,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:15CV00230 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **VIRGINIA DEPARTMENT OF** | ) | By: James P. Jones |
| **CORRECTIONS, ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Uhuru' Sekou Obataiye-Allah, Pro Se Plaintiff; Margaret Hoehl O'Shea, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Uhuru' Sekou Obataiye-Allah, a Virginia prison inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq*. Obataiye-Allah asserts constitutional challenges to the classification procedures and restrictive living conditions he has faced at Red Onion State Prison ("Red Onion") that allegedly deny him the ability to participate in group religious services. After review of the record, I conclude that the defendants' Motion for Summary Judgment must be granted in part and denied in part.[1]

---

[1] Obataiye-Allah has filed multiple responses to the defendants' motion. He has also requested the production of voluminous documentation that is either overbroad, not reasonably calculated to lead to the discovery of admissible evidence, or already

Obataiye-Allah is currently serving a term of confinement in the custody of the Virginia Department of Corrections ("VDOC"); his current expected release date is May 2035.[2]  He was transferred on July 16, 2012, from Sussex I State Prison ("Sussex I") to Red Onion, where he was assigned to the general prison population.  While in that housing assignment, Obataiye-Allah was charged with, and ultimately convicted of, a disciplinary infraction for possessing a weapon.  In December 2013, officials reassigned Obataiye-Allah to administrative segregation and increased his security level to "Level S" because of the seriousness of his recent infractions.

---

available to him, such as his own medical records.  Most importantly, although Obataiye-Allah alleges that he needs discovery to respond to the defendants' arguments, he has responded at length, without demonstrating that his lack of the requested materials hampered his ability to respond.  Moreover, the defendants' motion is based on Obataiye-Allah's own allegations and the challenged step-down policy itself and its related VDOC procedures.  Accordingly, I find that the Motion for Summary Judgment is ripe for consideration.

I note that the magistrate judge granted the defendants' motion seeking a protective order because their summary judgment motion raises a qualified immunity defense.  Generally, the defense of qualified immunity as a complete protection against trial or discovery is not available in "cases . . . where injunctive relief is sought instead of or in addition to [monetary] damages."  *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).  In this case, however, I conclude that granting the protective order was appropriate, although for different reasons as stated.

[2]  The VDOC website currently lists Obataiye-Allah's release date as May 24, 2035.

Red Onion and its sister facility, Wallens Ridge State Prison ("Wallens Ridge"), house all VDOC "Level S" inmates. Level S is reserved for inmates who must be managed in a segregation setting.[3] Under current policies, once a VDOC inmate is classified as Level S, officials transfer him to one of these facilities, where he may participate in the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 10-35, ECF No. 34-1.) This OP became effective on February 18, 2013, with the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The step-down program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges.

---

[3]   According to the current VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including the following: aggravated assault on a staff person or on another offender using a weapon or resulting in serious injury; serious risk of escape; "[c]ommission of a crime of exceptional violence and/or notoriety"; "[e]xcessive violent [d]isciplinary [c]onvictions"; fire setting or rioting in prison that harmed a person or caused extensive property damage; hostage taking; possessing firearms or other weapons; gang activity or leadership; and manipulating staff or displaying predatory behavior. (OP 830.2(IV)(G).)

-3-

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management ("IM"), special management ("SM"), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*)

Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id.*) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

-4-

Inmates are further sub-classified under OP 830.A as follows, starting with IM-0, the most restrictive status, and ending with the general population, the least restrictive:

Intensive Management (IM):
IM-0
IM-1
IM-2
IM-SL6
Special Management (SM):
SM-0
SM-1
SM-2
SM-SL6
Step-Down—Level VI General Population
Structured Living—Phase 1 and Phase 2
Security Level V General Population

The step-down program in OP 830.A is a so-called cognitive program that includes pro-social goals and requires the inmate to complete a workbook set called the *Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it.

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells. Per policy, they receive meals in their cells (the same types of meals that inmates in general

-5-

population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have two twenty-minute phone calls per month, one one-hour, non-contact visit per week, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM inmate may earn under OP 830.A at IM-1 and IM-2 include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities. An inmate progressing to SM-1 or SM-2 can earn even greater privileges.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step. Some inmates assigned to a lower step may be required to start over with the *Challenge Series*; they must then work with treatment staff to complete its exercises again to achieve positive changes in thought processes and social skills. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate.

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, track and rate each inmate's progress toward the goals of his assigned step. They rate his behavior every week as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. (OP 830.A(IV)(D).)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him into a social environment to interact with other inmates and test his readiness for possible transfer to Level V and, eventually, to other non-segregation settings. (*Id.*)

Inmates in the SL6 step-down pod may progress through two phases.[4] In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells

---

[4] In addition to the SM-SL6 step-down pod, inmates at this stage may be assigned to: (a) the secure allied management ("SAM") pod, designed for inmates who may be vulnerable to victimization because of cognitive impairment or other factors; or (b) the

unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants. (*Id.*) Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, have outside recreation with other inmates for an hour, twice a week, and can walk to meals with other inmates to eat their meals together in the dining hall.

The IM pathway under OP 830.A is different than the SM pathway. If an inmate reaches IM-2 status, and officials determine that he cannot progress to the SM steps toward classification to the SL6 pods, he can become eligible for assignment to the lowest security level for an IM status inmate: Level 6-IM, also known as the Closed Pod. The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security."[5] (OP 830.A(IV)(G)(1).) Closed Pod inmates continue to

---

secure integrated pod ("SIP"), designed for inmates who intentionally commit multiple minor disciplinary infractions to stay in segregated housing. The programming in the SAM and SIP pods differs from the step-down pod and is intended to assess inmates' ability to socialize safely with other inmates and encourage them toward a move to a general population.

[5] OP 830.A(IV)(G)(2)(g) states:

Restricted freedoms and interaction with staff and other offenders for the IM population is temporary. There is a strong commitment to develop a model to support an improved quality of life and greater opportunities for self-improvement for this dangerous population. The goal is to develop a management strategy that includes reduced restrictions, increased freedoms, and increased unrestrained interactions with others. However, at the time

have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts. Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

In addition to the weekly progress ratings by the Unit Management Team, OP 830.A(IV)(K)(5) requires that all segregation inmates, including those participating in the step-down program, be routinely reviewed by the Institutional Classification Authority ("ICA"). According to OP 830.A, Appendices F and G, Level S inmates are to receive an ICA review at least every ninety days. Among other things, the ICA reviews and acts on recommendations for step increases or reductions.

In addition to Unit Management Team review of an inmate's classification status, certain classification decisions are also reviewed by a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge, by the wardens of the two institutions, or by the VDOC regional operations chief. In addition to this multi-level review scheme, according to OP 830.A(IV)(K)(1)(a), "[a] team

---

of this writing, guidelines or models are not available for predicting safety with a population that has a proven history of carrying out extreme and/or deadly violence. Once the larger Step-Down plan in general is implemented and stable, attention will be focused on additional IM step-down opportunities.

-9-

external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for the IM or SM path to which he has been assigned. According to OP 830.1(IV)(G)(2), which is available online,[6] all classification decisions may be appealed through the Offender Grievance Procedure.

In December 2013, Obataiye-Allah was assigned to Level S at Red Onion; in February 2014, he was transferred to Sussex I for court proceedings. The Sussex I ICA conducted a review of his status and assigned him to administrative segregation; the report of that review notes Obataiye-Allah's statement that "I fear for my safety at [Red Onion]. They have been retaliating against me." (Hamilton Aff. Ex. 1, Enclosure G, at 58, ECF No. 34-1.) Obataiye-Allah was returned to Red Onion in March 2014.

On March 24, 2014, a Red Onion ICA reviewed Obataiye-Allah's status and approved him for assignment to SM-0. The report of this review notes Obataiye-Allah's statement that "Someone is gonna answer for this shit and all my shit that's gone." (*Id.* Enclosure I, at 62, ECF No. 34-1.)

In September 2015, authorities in Sussex County, Virginia, initiated criminal proceedings against Obataiye-Allah (under his former name, Johnathan Talbert)

---

[6] *See* https://vadoc.virginia.gov/about/procedures/documents/800/830-1.pdf (last visited on September 27, 2016).

for gang participation, solicitation to commit murder, solicitation to commit assault, and two counts of solicitation to assault a corrections officer. *See Commonwealth v. Talbert*, CR15-000-209 through -213.[7] According to the public court records, the offenses occurred on March 7, 2014. A grand jury returned an Indictment charging Obataiye-Allah with these offenses in September 2015, and the case is currently scheduled for trial in November 2016.

In May 2014, Obataiye-Allah was transferred to Sussex II State Prison ("Sussex II") for ten days to attend court proceedings. After he was returned to Red Onion, the ICA reviewed his security level on June 2, 2014 and recommended that he remain assigned to Level S. The report of that review notes Obataiye-Allah's statement that "I am being retaliated against by [Red Onion]." (Hamilton Aff. Ex. 1, Enclosure L, at 70, ECF No. 34-1.) In July 2014, at Obataiye-Allah's annual review, his good time earning level was reduced to Level 4 (earning no good time) because of his numerous institutional infractions. The report of this review notes that while Obataiye-Allah had not held a work assignment during the review period, he did complete the first two books in the *Challenge Series* treatment program.

---

[7] While both parties mention these criminal charges, I have also taken judicial notice of the dates listed in state court records available online. *See* http://ewsocis1.courts.state.va.us/CJISWeb (last visited Sept. 22, 2016).

In September 2014, after another review, the ICA changed Obataiye-Allah's status and housing assignment from SM-0 to IM-0. The report of this review indicates that Obataiye-Allah made no statement and does not cite the reason for this status change. Since his assignment to IM-0, the ICA has reviewed Obataiye-Allah's housing assignment every ninety days and has continued him in that status. The reports of the reviews from October 2014, January 2015, March 2015, and June 2015 do not state a reason for Obataiye-Allah's continued IM-0 status. Defendant I. Hamilton, Red Onion's Assistant Warden, states that Obataiye-Allah remains in IM-0 "because of his lack of participation in the requirements of the step-down program," his poor behavior, and his institutional infractions. (Hamilton Aff. Ex. 1, at 8, ECF No. 34-1.) Obataiye-Allah denies that he has refused to participate in the step-down program and states that he has been told that he is assigned to IM status because of his pending criminal charges.[8]

Liberally construed, Obataiye-Allah's verified § 1983 Complaint asserts the following claims: (1) application of OP 830.A to assign him to the IM pathway violates his substantive and procedural due process rights; (2) the different treatment of IM and SM inmates under OP 830.A violates his right to equal

_____

[8] In June 2016, Obataiye-Allah notified the court that he had been transferred to Sussex II. Nothing in the record indicates whether this reassignment is long-term or only a temporary accommodation of upcoming court proceedings. For the purpose of this Opinion, I will assume that Obataiye-Allah will be returned to Red Onion at some time after the court proceedings are concluded.

-12-

protection;[9] (3) his living conditions, as an IM-0 inmate, violate his Eighth Amendment rights; (4) he is being kept in IM status by Red Onion officials in retaliation for his alleged attempts to kill or assault officials at Red Onion, which are the events underlying his pending criminal charges; and (5) preventing him, as an IM inmate, from attending group religious services in person or via closed circuit television violates his rights under the First Amendment and RLUIPA. Obataiye-Allah sues VDOC and Red Onion administrators for signing OP 830.A into effect and failing to correct the alleged constitutional violations. He seeks monetary damages and injunctive relief ordering the abolition of OP 830.A, reclassification with due process, and the permitted participation of all Muslim inmates in Jumah services, either in person or via closed circuit broadcasting.

In Obataiye-Allah's Complaint and other submissions, he alleges that OP 830.A discriminates against IM inmates, who suffer a much more restrictive environment than inmates in other forms of administrative segregation; that IM status permanently prevents an inmate from working his way out of segregated confinement at Red Onion by completing the Challenge Series, whereas SM-status inmates who complete the same series can work their way to general population;

---

[9] As part of his equal protection claim, Obataiye-Allah contends that IM status is used to discriminate against inmates of color, inmates with gang affiliations (particularly those who, like Obataiye-Allah, are members of the Bloods), and inmates who file complaints, grievances, or lawsuits.

-13-

that officials arbitrarily assigned him to IM-0 status, without notifying him when or why he was so assigned and with no means to appeal his assignment;[10] and that since his assignment to IM-0, reviews of his status under OP 830.A have not been meaningful because officers do not state any reason for keeping him at IM-0. He contends that he does not qualify for IM status because he has no institutional charges for violent offenses, and he claims that officers have given him "fabricated charges" that prevent his progress in the step-down program. (Compl. ¶ 52, ECF No. 1.)

Obataiye-Allah also contends that the *Challenge Series* is a "psycho therapy/treatment" that violates VDOC mental health treatment policies by requiring him to discuss his mental health with treatment officers who are not Qualified Mental Health Professionals ("QMHPs"). (Compl. ¶¶ 60-61, ECF No. 1; Pl.'s Mem. Opp'n Summ. J. 5-6, ECF No. 39.) Obataiye-Allah also asserts that the *Challenge Series* is used to discriminate against inmates on the basis of color, gang affiliation, and whether they have filed grievances, as evidenced by the number of such inmates assigned to IM status. He complains that a particular white inmate, who was convicted of stabbing his cellmate and sentenced to twenty additional

---

[10] Specifically, Obataiye-Allah alleges that although officers told him in March 2014 that he was SM-0 status, in June 2014, the grievance coordinator told him that he had been IM status since March 2014.

years in prison, was assigned to the SM pathway and returned to general population status within less than a year.

Obataiye-Allah further alleges that assignment to the IM pathway constitutes cruel and unusual punishment because IM inmates can earn no less restrictive assignment than the Closed Pod. Although the Closed Pod is Level 6, rather than Level S, he contends that it is no better than other IM housing assignments because inmates are still under armed guard, cannot have out-of-cell movement without restraints and escort guards, have limited jobs, programs, and socialization opportunities, and have their cells reassigned every ninety days. He complains that, as an IM inmate, he cannot walk to the dining hall, law library or education classes and cannot enjoy in-pod recreation or outside yard activities with other inmates. IM inmates receive one hour of outside recreation in a cage, five times per week, and they stay in their cells twenty-three hours a day. An IM-0 inmate also has no commissary food privileges or access to his own television. Obataiye-Allah claims that his IM status has caused him to lose the ability to earn good conduct time, deprived him of social interactions and rehabilitation programming, and caused him to suffer anxiety, headaches, loss of sleep, physical deterioration, weight loss, and "(to [his] belief) akathisia." (Compl. 25, ECF No. 1.)

Obataiye-Allah also alleges that Red Onion officials have retaliated against him for his pending criminal charges and past litigation efforts against Red Onion

defendants. He says he has been accused of plotting to kill or poison wardens and other staff at Red Onion, Wallens Ridge, and Keen Mountain Correctional Center. He claims that Red Onion officials have withheld his meals, recreation, and showers, placed him in mental health cells, and threatened to kill him because of these criminal charges.

Finally, Obataiye-Allah contends that Red Onion must accommodate his religious practice of participating in group "Jumah Services," either in person or via "closed-circuit televisions" in his cell or in the pod. (Compl. ¶ 29, ECF No. 1.) The record indicates that Obataiye-Allah is a self-described, lifelong follower of Nation of Islam ("NOI") beliefs. He attended religious services when he was in the general population and has regularly participated in the Common Fare religious diet and the annual Ramadan fast. He is also allowed to possess a Quran, a prayer rug, NOI lessons, and a Kufi. Obataiye-Allah asserts that Jumah services on Fridays are mandatory for NOI followers and that he cannot perform this ritual alone in his cell.

The defendants have filed a Motion for Summary Judgment, supported by copies of OP 830.A, its charts of IM and SM requirements, and its progress report forms. They also present the affidavit of Red Onion's Assistant Warden, I. Hamilton, describing these and other relevant procedures as well as Obataiye-Allah's progress through the step-down procedures.

-16-

II.

A.  Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

I must draw all reasonable inferences from the facts in favor of Obataiye-Allah, the nonmoving party.  *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).  Detailed factual allegations in a verified, pro se complaint may be sufficient to withstand a motion for summary judgment with supporting affidavits containing a conflicting version of the facts.  *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis omitted) (citation omitted)).

-17-

B.  Due Process.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.  "To state a procedural due process violation,[11] a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

As a convicted prisoner, Obataiye-Allah does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification.  *Id.* at 221-22.  A state-created liberty interest may exist, however, if Obataiye-Allah (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation

---

[11]  Obataiye-Allah also alleges that OP 830.A violates his substantive due process rights.  Such a claim fails, however.  It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause."  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  Thus, Obataiye-Allah's claims that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause."  *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015).  Therefore, I will address Obataiye-Allah's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

-18-

classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; and (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Only if Obataiye-Allah makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest. *Id.*

Obataiye-Allah expressly states that he is challenging, not his classification to Level S, but rather, his initial classification to IM status under OP 830.A and the subsequent decisions to continue his IM-0 status. He apparently believes that these procedures stand in his way of being released sooner from segregation to general population conditions. VDOC procedures provide that at least every ninety days, the ICA will review each Level S inmate — including those participating in the step-down program — to determine whether he has met the goals of his step assignment and is eligible for advancement to another step. (*See* OP 830.A(IV)(K)(5) and Apps. F & G.) I conclude that this periodic review policy creates a potential liberty interest for Obataiye-Allah in avoiding and in being released from the restrictive conditions of his current step assignment. *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's

policy requiring periodic classification reviews for segregation inmates created potential liberty interest).[12]

I must next determine if Obataiye-Allah's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. The "conditions dictated by a prisoner's conviction and sentence are the conditions constituting the 'ordinary incidents of prison life' for that prisoner." *Prieto*, 780 F.3d at 253. Neither party has provided me specific information about restrictive conditions, if any, dictated by the sentences Obataiye-Allah is serving. Given that Obataiye-Allah was confined in the VDOC's general population prior to December 2013, I will use the general population status as the normative baseline for his due process claim. *See Incumaa*, 791 F.3d at 527 (concluding "that the general population is the baseline for atypicality for inmates who are sentenced to confinement in the general prison population and have been transferred to security detention while serving their sentence").

---

[12] The defendants argue that, under *Prieto*, the liberty interest potentially created by regular review of an inmate's segregation status applies only to the inmate's assignment to Level S, not to his assignment to the IM or SM pathways. I do not agree. Because the ICA's regular reviews of Obataiye-Allah's segregation status include review of his current step assignment under OP 830.A and affect his progress toward release from segregation, I find that the ICA review procedure creates a potential liberty interest in an inmate's IM or SM status as well as in his segregation status.

-20-

The atypical hardship requirement is difficult to satisfy. Mere limitations on privileges, property, and activities for administratively segregated inmates, and even disciplinary action "in response to . . . misconduct fall[ ] within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485; *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (holding that "changes in a prisoners' [sic] location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges — matters which every prisoner can anticipate are contemplated by his original sentence to prison — are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently"). It is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization opportunities, and heightened security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (finding six months under conditions dictated by administrative segregation policies was not atypical under *Sandin*). Moreover, "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson,* 545 U.S. at 227. Thus, "correctional officials . . . must have substantial discretion to devise reasonable solutions to the problems they face" in maintaining

-21-

prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 132 S. Ct. 1510, 1515 (2012).

Most importantly, the Supreme Court has consistently employed a due process analysis that encourages prisons to implement written management policies while minimizing the involvement of the federal courts "in the day-to-day management of prisons." *Wilkinson*, 545 U.S. at 222 (citing *Sandin*, 515 U.S. at 482-83). "This approach . . . provides inmates and prison administrators with clear notice of a prisoner's rights, but it also permits a given state to codify procedures establishing very restrictive confinement conditions." *Prieto*, 780 F.3d at 255. District courts must respect the Supreme Court's "judgment that this trade-off strikes the correct balance between the dictates of the Due Process Clause and the pressures on state correctional systems." *Id.*

In *Wilkinson*, without a point-by-point comparison of segregation and general population conditions, the Supreme Court found that inmates had a protected liberty interest in avoiding assignment to a particular state "supermax" prison. In reaching this conclusion, the Court carefully distinguished the supermax conditions from normal segregation unit conditions on three grounds. First, inmates in the supermax facility were "deprived of almost any environmental or

-22-

sensory stimuli and of almost all human contact."[13] *Wilkinson*, 545 U.S. at 214.

Second, they were assigned for "an indefinite period of time, limited only by [the]

inmate's sentence." *Id.* Third, once assigned to supermax, "[i]nmates otherwise

eligible for parole lose their eligibility while incarcerated" at the facility. *Id.* at

215. The Court stated: "While any of these conditions standing alone might not be

sufficient to create a liberty interest, taken together they impose an atypical and

significant hardship within the correctional context." *Id.* at 224.

Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in

avoiding assignment to South Carolina's supermax based on the isolating and

restrictive nature of the living conditions combined with the length and

indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-

32. In addition to conditions similar to those at issue in *Wilkinson*, the plaintiff in

*Incumaa* was subjected to "a highly intrusive strip search every time he [left] his

cell." *Id.* at 531.

Prison policies gave rise to the indefinite terms of supermax confinement

that concerned the courts in these cases. In *Wilkinson*, prison policies provided "no

---

[13] The conditions at the supermax at issue in *Wilkinson* included the following: "Almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." *Id.* at 223-24. The Court noted, however, that the lack of human contact was the most distinctive of these living conditions and that the conditions were atypical when combined with the additional factors of indefinite duration and disqualification for parole. *Id.* at 224.

-23-

indication how long [an inmate] may be incarcerated [at the supermax] once assigned there." 545 U.S. at 215. In addition, policy required infrequent review of the continued appropriateness of an inmate's specific segregation status: once initially, thirty days after his arrival, and annually thereafter. *Id.* at 217. The policy at issue in *Incumaa* required review of the plaintiff's status every thirty days by an institutional classification committee ("ICC"), but that review process provided no clear criteria for him to become suitable for release from the supermax. 791 F.3d at 522-23. Assigned to the supermax as a member of a security threat group, policy provided that the plaintiff could nevertheless qualify for reclassification and release from the supermax by achieving an "improvement in behavior level." *Id.* Policy further defined "behavior level" as including a clear disciplinary record and the ICC's evaluation of the plaintiff's overall compliance with "policies and procedures" of the institution. *Id.* at 522. In twenty years, the plaintiff had never incurred a disciplinary infraction, but the ICC repeatedly recommended his retention at the supermax without providing any behavioral basis for doing so. *Id.* at 521-23.

Without question, VDOC inmates classified to Level S, particularly IM status, are confined under highly restrictive conditions at Red Onion, including single-cell assignment, limited out-of-cell activity and face-to-face contact with other inmates, and movement outside the cell only in full restraints and with dual

escorts. Out-of-cell movement may also involve a visual strip search, although the parties do not present evidence on this issue. The mere existence of these conditions at Red Onion, however, does not render confinement there atypical or significantly harsh, because general population inmates can expect temporary terms in segregated confinement under similar restrictions. *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120 F.3d at 504 (six months).

After careful review of OP 830.A, I conclude that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate like Obataiye-Allah is subject to long-term, restrictive conditions, but that status need not be permanent or indefinite if the inmate chooses to participate fully in the step-down procedures. OP 830.A provides behavioral criteria for the inmate to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior as he works through the *Challenge Series*, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A,

-25-

an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Obataiye-Allah complains that any given official can purposely use OP 830.A, along with allegedly fabricated disciplinary charges, to prolong an inmate's confinement in IM conditions. I conclude that the team assessment approach and the multi-level classification review procedures built into OP 830.A and the other VDOC policies protect against such willful, individual action denying any one inmate the ability to move through the steps. Moreover, if Obataiye-Allah believes that procedural errors or miscalculations have occurred during a classification proceeding, current policy allows him to challenge the decision through the Offender Grievance Procedure, OP 830.1(IV)(G), or file a request for an interim review of his classification based on procedural or calculation errors. (*See* OP 830.1(IV)(E).) He can also challenge any institutional charges levied against him through the separate Disciplinary Appeal procedure provided in OP 861.1(XVIII).

Obataiye-Allah also fails to state facts showing that his IM-0 status alone caused the reduction in his good time earning rate. The record indicates that the ICA based this reduction on Obataiye-Allah's disciplinary record. His disciplinary record could also legitimately be considered, separately, by the ICA when reviewing his IM-0 status. I find no evidence in the record that IM or SM classification inevitably affects the length of an inmate's confinement so as to

trigger a separate, constitutionally protected liberty interest in avoiding that classification. *Sandin*, 515 U.S. at 487.

For the reasons stated, I find no material fact in dispute on which Obataiye-Allah can establish that his confinement at Red Onion under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence. Conditions in IM-0 status, while restrictive, can improve in defined stages based on Obataiye-Allah's own efforts toward cognitive and behavioral changes. Indeed, the OP 830.A procedures themselves prevent confinement at Red Onion from falling into the category of indefinite isolation identified in *Wilkinson* and *Incumaa* as triggering constitutional due process protections. Thus, I conclude that Obataiye-Allah has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification proceedings. *Sandin*, 515 U.S. at 486-87.

Obataiye-Allah also has no claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures themselves. Obataiye-Allah complains about the procedures used to reduce his classification to IM status and the reasons given — or not given — for that status change; his assignment to a low step status despite having no violent disciplinary convictions; officials'

-27-

occasional failure to document the rationale underlying their status decisions; and officials' misstatement of the date he was approved for a status change. However, all these actions are, at most, alleged violations of the OP 830.A policies themselves. State officials' failure to abide by state procedural regulations is not a federal due process issue, and is, therefore, not actionable under § 1983.[14] *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Obataiye-Allah's claims that one or more of them violated his constitutional rights by assigning him to IM status under OP 830.A without due process. I will grant the Motion for Summary Judgment on Obataiye-Allah's due process claims accordingly.

---

[14] For the same reason, Obataiye-Allah has no actionable § 1983 claim arising from his allegation that the defendants have violated VDOC policy by allowing officers who are not QMHPs to review his answers to *Challenge Series* questions about his thoughts and feelings. This alleged violation of a state policy is not a federal due process issue, and I decline to exercise supplemental jurisdiction over any state law claim Obataiye-Allah may be attempting to pursue on this matter. *See* 28 U.S.C. § 1367(c)(3).

## C. Equal Protection.

The Equal Protection Clause[15] generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." *Veney*, 293 F.3d at 732 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.*

Obataiye-Allah's equal protection challenge to OP 830.A is multifaceted. He alleges that the policy treats IM inmates more harshly than SM inmates, because the IM pathway ends in the Closed Pod; that he was and is arbitrarily

---

[15] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

assigned to IM status despite not meeting the criteria; and that officials use IM status to punish inmates who are not white, who are gang members, and who file complaints and lawsuits. He does not state facts supporting the necessary elements of any of these equal protection challenges.

First, IM and SM inmates as defined in the policy are not similarly situated. Under the policy, officials assign a Level S inmate to a pathway based on an individualized assessment of that inmate's history — both before and during incarceration — and his attitudes toward violence. According to OP 830.A(III), an inmate qualifies for IM status if, among other things, his crime is notorious, "extreme/deadly violence has become a behavior characteristic" for him, or he has demonstrated a "routinely disruptive and threatening pattern of behavior and attitude." By contrast, an inmate qualifies for SM status when his past disruptive behaviors in prison, even if harmful to others, do not indicate an "intent to invoke serious harm, or the intent to kill, or [cause] serious damage to the facility." (OP 830.A(III).)

Moreover, the different treatment of these two groups under the OP 830.A scheme is rationally related to legitimate governmental purposes. Namely, this procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety." OP 830.A(I). So long as

-30-

an inmate's crime or behavior continues to place him in the IM category, officials have a legitimate reason to continue housing him in a secure setting, such as the IM steps and Closed Pod provide. The logical connections between the policy's provisions and the furtherance of its legitimate penological goals are self-evident. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

Second, Obataiye-Allah has not alleged facts supporting his contention that he was assigned to IM status because of his race or past grievances and litigation, rather than because of the IM status qualifications outlined in OP 830.A(III). Obataiye-Allah's history of disciplinary infractions, both before and after his assignment to IM status, shows a pattern of disruptive and threatening behavior, which is a nondiscriminatory factor for his assignment to IM status. Moreover, even accepting as true Obataiye-Allah's claim that he has been participating in the *Challenge Series*, remaining infraction free is also a factor in progressing under the step-down procedure, and he has not met this requirement. His conclusory assertion that officials fabricated some or all of the disciplinary charges against him does not eliminate the offenses in his record as a basis for his IM status change, and, as stated, he has a separate procedural avenue to challenge the validity of the charges. Furthermore, officials can reasonably consider the seriousness of his pending criminal charges as evidence of a tendency toward

Case 7:15-cv-00230-JPJ-RSB   Document 62   Filed 09/28/16   Page 31 of 42   Pageid#: 407

extreme violence, which, absent other factors to the contrary, is another basis for continued IM status.

Finally, an inmate's assignment to IM status is necessarily based in part on officials' assessment of the inmate's characteristics and attitudes, which are much less tangible elements than the inmate's paper record of crimes and infractions. Similarly, a step increase within the IM pathway requires, not only completed workbooks, but also the classification officers' recognition that the inmate is working to make positive changes in his thinking and behavior. Thus, Obataiye-Allah cannot rely solely on the criminal record of one white inmate assigned to the SM pathway, or the number of inmates of color assigned to IM status, to prove that his own IM classification or continued IM-0 status has violated equal protection principles.

For the stated reasons, I find no material dispute of fact on which Obataiye-Allah could prove an equal protection violation here. Therefore, I conclude that the defendants are entitled to summary judgment as a matter of law and will grant their motion on this claim.

## D. Eighth Amendment.

Obataiye-Allah also asserts that his status under OP 830.A offends the prohibition against cruel and unusual punishment of the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned."

-32-

*Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981). It is well established that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (internal quotation marks and citations omitted).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Obataiye-Allah's allegations do not show that he has suffered any Eighth Amendment violation while subject to the living conditions under OP 830.A at Red Onion. He does not allege that he was deprived of any necessity for life, such as food, shelter, or medical care. Rather, he complains about restrictive conditions and limited privileges, programming, and socialization opportunities. As

-33-

mentioned, he alleges that these characteristics of IM status have caused him to suffer anxiety, headaches, loss of sleep, physical deterioration, weight loss, and "(to [his] belief) akathisia." (Compl. 25, ECF No. 1.) Obataiye-Allah fails to state facts, however, showing that any of these health concerns qualifies as a serious or significant harm or that he ever required medical care. For the stated reasons, I find no material dispute of fact on which Obataiye-Allah could prove that he has been subjected to unconstitutional conditions. Accordingly, I will grant the defendants' Motion for Summary Judgment as to his Eighth Amendment claim.

### E. Retaliation.

Retaliation against an inmate for the exercise of his First Amendment right of access to the courts can support a claim for relief under § 1983. *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978). To state such a claim, the plaintiff must state facts showing that his exercise of his constitutional right was a substantial factor motivating the alleged retaliatory action. *See, e.g., Wagner v. Wheeler*, 13 F.3d 86, 90-91 (4th Cir. 1993) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (requiring plaintiff to show "a causal relationship between the protected expression and the retaliatory action"). Mere "temporal proximity" between the inmate's protected activity and the official's subsequent adverse action toward the plaintiff "is simply too slender a reed on which to rest" a §1983 retaliation claim. *Wagner*, 13 F.3d at 91. Obataiye-Allah

-34-

must present more than conclusory allegations of retaliation. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994).

Obataiye-Allah's retaliation claim is based merely on conclusory conjecture that prison officials have taken adverse actions against him because he has filed lawsuits in the past. He has not presented "factual allegations tending to support his bare assertion" that his past litigation or pending charges substantially motivated the actions of which he complains.[16] *Id.* at 74. Moreover, to the extent that Obataiye-Allah alleges retaliation for his incurring criminal charges, his claim is missing a critical element: his exercise of a constitutionally protected activity. Simply being the recipient of criminal charges is not an exercise of a constitutionally protected right. If Obataiye-Allah has evidence that Red Onion staff harbor resentment toward him that makes his incarceration at Red Onion hazardous, he may pursue appropriate administrative remedies seeking reassignment. He may not, however, argue that actions taken against him at Red Onion because of those charges constitute retaliation for his exercise of a constitutionally protected right.

---

[16] Obataiye-Allah's allegations that Red Onion staff have made verbal threats toward him do not state any constitutional claim. *Henslee v. Lewis*, 153 F. App'x 178, 180 (4th Cir. 2005) (unpublished per curiam) (citing *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979)).

For the reasons stated, I find no material dispute of fact on which Obataiye-Allah could prove his retaliation claims. Accordingly, I will grant the defendants' Motion for Summary Judgment as to this claim.

## F. Religious Rights.

Under the Free Exercise Clause of the First Amendment, prison officials must reasonably accommodate an inmate's exercise of his sincerely held religious beliefs. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1987). Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration" and must therefore defer to the expertise of prison officials in crafting policies addressing those problems, a prison regulation is "'valid if it is reasonably related to legitimate penological interests.'" *Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). This determination turns on a four-factor test: (1) "whether there is a valid, rational connection between the prison regulation" and the asserted government interest; (2) whether Obataiye-Allah was "deprived of all forms of religious exercise or [was] able to participate in other observances of [his] faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any obvious, easy alternatives to the challenged regulation." *Id.* at 200 (internal quotation marks and citation omitted).

-36-

Obataiye-Allah alleges that because of the limited privileges granted to IM-0 status inmates, he can neither attend NOI group religious services nor view them on a television in his pod. The defendants argue that Obataiye-Allah's claim fails under the four-factor *Turner* test, and I agree. Officials have clearly established security reasons for keeping IM status inmates physically separate from other inmates, and setting up a television broadcast of group services in the IM pod would require additional staffing burdens and costs. The IM-0 regulations clearly further these interests in security and resource management. Moreover, Obataiye-Allah can practice his religious beliefs in many other ways, including engaging in personal study of religious texts and prayer in his cell, receiving his special religious diet, and participating in the annual Ramadan fast. Obataiye-Allah has not stated facts showing easy alternatives that would both accommodate his beliefs and further prison interests. Thus, I conclude that the defendants are entitled to summary judgment on Obataiye-Allah's claim that IM-0 regulations violate his free exercise right under the First Amendment.

RLUIPA provides federal statutory protection of prisoners' religious exercise under a stricter legal standard: "RLUIPA prohibits [state] prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means." *Miles v. Moore*, 450 F. App'x 318, 319

-37-

(4th Cir. 2011) (unpublished per curiam) (citing 42 U.S.C. § 2000cc-1(a)). A RLUIPA analysis contains two steps. First, the inmate "bears the initial burden to demonstrate that the prison's policy exacts a substantial burden on religious exercise." *Incumaa*, 791 F.3d at 525. For purposes of a RLUIPA claim, "a substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace*, 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Then, if the inmate proves that there is a substantial burden, "the burden shifts to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Incumaa*, 791 F.3d at 525.

The defendants argue that Obataiye-Allah has not met his initial burden to show that his inability to attend or view group religious services has substantially burdened his religious practice. I cannot agree. Obataiye-Allah contends that participation in a group NOI service, like the one conducted for other inmates at Red Onion on Fridays, is mandatory for his faith and cannot be performed alone in his cell. Taking this evidence in the light most favorable to him, I find that he may be able to prove his RLUIPA claim by showing that the IM-0 restrictions prevent him from participating in the group religious service, as he did regularly when in less restrictive housing assignments, thus causing him to violate his beliefs by not

adhering to this allegedly mandatory practice. The defendants have not provided evidence or argument on the second part of the RLUIPA standard: whether the policy of prohibiting IM-0 status inmates like Obataiye-Allah from any participation in the NOI group religious services, including the closed circuit television option he proposes, furthers a compelling governmental interest by the least restrictive means. Accordingly, I must deny their Motion for Summary Judgment as to Obataiye-Allah's RLUIPA claim for permanent injunctive relief.[17]

I will grant the defendants' motion, however, on Obataiye-Allah's claim for monetary damages related to his RLUIPA claim. He cannot recover monetary damages against the defendants in either their official or individual capacities. *See, e.g., Sossamon v. Texas*, 563 U.S. 277, 285-86 (2011) (finding damages not recoverable against defendants in their official capacities under RLUIPA); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (finding no RLUIPA claim for damages available against defendants in their individual capacities).

The copy of OP 830.A in the record is signed by three defendants: R.C. Mathena, the former Warden of Red Onion; Gregory Holloway, the Warden of

---

[17] It may be that Obataiye-Allah's transfer from Red Onion to Sussex II moots this claim. As a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration at that prison. *See, e.g., Incumaa v. Ozmint*, 507 F.3d 281, 286-87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). The record indicates, however, that Obataiye-Allah has been returned to Red Onion following court proceedings in the past, and I find no evidence that he will not be returned to Red Onion following his pending trial in November.

Case 7:15-cv-00230-JPJ-RSB   Document 62   Filed 09/28/16   Page 39 of 42   Pageid#: 415

Wallens Ridge; and G.K. Washington, the Regional Operations Chief for the western region of VDOC. These officials are identified in OP 830.A as "officer[s] of primary responsibility" to review and rewrite the policy. (Hamilton Aff. Enclosure A, at 21, ECF No. 34-1.) Thus, as to Obataiye-Allah's RLUIPA claim for injunctive relief related to religious services while he is assigned to IM-0 status, I will deny summary judgment for the individuals currently holding these three offices.

Obataiye-Allah has not stated that the other named defendants have any professional responsibility for enacting or revising policies that apply only to Level S inmates at Red Onion and Wallens Ridge. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") Therefore, I will grant summary judgment for all defendants except these three defendants in their official capacities: Earl Barksdale (the current Warden of Red Onion), Holloway, and Washington.[18]

---

[18] If public officials who are defendants in their official capacities leave such positions, their successors are automatically substituted as parties. Fed. R. Civ. P. 25(d). The defendants are directed to advise the court in any such case of the names of the substituted parties.

-40-

III.

For the reasons stated, I conclude that Obataiye-Allah's constitutional challenges to OP 830.A are without merit and that the defendants are entitled to summary judgment as a matter of law.  It is accordingly **ORDERED** as follows:

1. The defendants' Motion for Summary Judgment (ECF No. 33) is GRANTED IN PART AND DENIED IN PART.   The motion is DENIED as to the RLUIPA claim for injunctive relief against defendants Barksdale, Holloway, and Washington in their official capacities.  The motion is GRANTED as to all other claims and defendants.   The clerk shall terminate the case as to the other defendants;

2. Any claims under state law are DISMISSED without prejudice, pursuant to 28 U.S.C. § 1367(c), as I decline to exercise supplemental jurisdiction over such claims; and

3. The defendants are GRANTED LEAVE to file, within twenty-one days from entry of this order, any additional motion for summary judgment supported by affidavit or declaration as to the RLUIPA

-41-

claim for injunctive relief against defendants Barksdale, Holloway, and Washington.[19]

ENTER:   September 28, 2016

/s/  James P. Jones
United States District Judge

---

[19]   It is also **ORDERED** that all claims against the defendants identified as the External Review Team, the Dual Treatment Team, and the Unit Management Team are DISMISSED as legally frivolous, pursuant to 28 U.S.C. § 1915A(b)(1).  These groups of individuals are not "persons" subject to suit under § 1983.  *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 70-71 (1989).  In any event, for the reasons stated, Obataiye-Allah has stated no actionable § 1983 claim against any of the individual members of these teams.